All right, very well then Mr. Kornfeld, we'll hear from you first. Thank you, your honor. Good afternoon, judges. May it please the court. My name is Rick Kornfeld. I represent several St. Louis dental practices that were forced to close for all but a few emergency patients because of the COVID-19 pandemic in March 2020. They sued to recover their business losses under their insurance policies with the defendants. The district court dismissed the case on three grounds. First, it ruled there was no coverage because the required direct physical loss wasn't there. Second, it ruled that the claim was barred by the policy's virus exclusion. And third, it rejected our argument that even if the virus exclusion applied, there was coverage under the policy's limited virus coverage. Since the day this case was fully briefed, there have been more than a dozen decisions of other federal circuits with cases similar to ours. At this point, as of this morning, I counted 17 cases in all, including the eighth circuits and oral surgeons. They have all affirmed district court dismissals. So in the time I have, I'd like to focus on those cases and explain why they don't dictate the same result here. Let me start with the first issue, whether the plaintiff's suspension of business was caused by direct physical loss of or damage to the property at their premises. Our argument here is pretty simple. The district court ruled that this provision requires physical alteration of the property, but that confuses loss of property with damage to property. Loss of has to mean something different from damage to, or else it's surplusage. It's redundant, which is not allowed under Missouri law. The only sensible way to interpret loss of is that it covers and ensures physical loss in the sense of a physical inability to fully access the property. Most of the 17 appellate decisions have nothing to say about that question. Four of the cases, including oral surgeons, dealt with policies with coverage only where there was loss to the property. The others were Gilbreath in the sixth circuit and Sandy Point in Crescent Plaza in the seventh. Two cases didn't deal with the issue of direct physical loss. Those were Chattanooga Pro Baseball in the ninth circuit, which was decided only on the virus exclusion, and Dakota Girls in the sixth where the plaintiff relied only on a communicable disease provision. Isn't there a difference though between loss of property and then the loss of the use of it in the way that the dentists here want to use it? In other words, the property was still there available, as I understand it, they could go and under the guidance do emergency dental procedures. Isn't that a distinction that's at the meaning of the word loss? If I can just go to one of the appellate decisions that was Santos in the sixth circuit, looked at that and said that was a restaurant. They could use their premises for carry out and delivery and said, well, they didn't have a total loss. As you point out, my clients were able to use their offices for a few emergency procedures. But if you look at the meaning of the word loss, loss doesn't necessarily mean total loss. Missouri says, look at how a word is used in its everyday usage. Well, in our everyday usage, we talked about hair loss, which is not total baldness. We talk about hearing loss. It's not complete deafness. You can still hear some. We talk about gambling loss, but you still can walk out of the casino with some of your chips. An investment loss, your stocks haven't gone down to zero. Similarly here, they lost most of the access of their normal dental practice. Of the 11 circuit decisions that have looked at the same phrase here, direct physical loss of or damage to property, only two of them have considered our argument that the way that the district court interpreted that phrase renders loss of surplusage or redundant, which is how Missouri says not to interpret a policy. Those two decisions were Santos, I mentioned that in the Sixth Circuit and Goodwill in the 10th. What they said besides what that loss and damage don't mean the same thing here, because you could have a loss that doesn't damage the property, but they only mentioned one example of that, and that was theft that doesn't damage the property. The defendants argue that in this case too, but I would submit that makes no sense for two reasons and shouldn't be followed here. First, the policy doesn't say theft. It says loss. If they meant that loss was theft, they should have used the more specific word theft. Second, that's especially the case because only personal property can be stolen. You can't steal the plaintiff's offices. If they meant that loss applied only to personal property, they should have said that. For the defendants now to say that loss means theft, it's facts of an after the fact attempt to justify their desired result. It's something that they came up with after they got sued, but not what they meant when they wrote the policies or they would have been clearer about that. In Missouri, insurance policies aren't supposed to be interpreted in a way that so long as you can find a meaning that would deny coverage, that's enough. It's the opposite. You have to look and see if there's a meaning that would allow coverage and apply that meaning. Your honors, there was also a Seventh Circuit case that said loss could be different from damage. That was Sandy Point where the policy said loss or damage to, not loss of or damage to as ours does, but I'd like to talk about what the court said there. They said that loss meant complete destruction while damage connotes lesser harm that may be repaired. But that's also, I would submit, wrong and shouldn't be followed. It doesn't give those two words a different meaning in the terms of this policy because both complete destruction and damage entail physical alteration. Again, that smacks of an after the fact attempt to justify finding no coverage, not what the words meant when the policy was written. Now, I'd also like to talk about the term period of restoration because a number of appellate courts looked at that term. The policy holder is entitled to recover losses that occurred during the period of restoration, which is defined as the period that ends when the property is, quote, rebuilt, repaired, or replaced, unquote, which they said required physical damage to occur. But that ignores the dictionary definition of repair. Repair means to restore to a sound or healthy state. That's what happened when dentists acquired filters and protective equipment, which restored their offices to a healthy state. For that reason, the period of restoration doesn't require physical alteration of the property. In short, no appellate- Is that a restoration to a healthy state or is that just preventing the virus from getting into the building? Because as I understand the complaint, there's no allegation that the dentist had the virus in their dental offices. Am I correct there? Yes, that's right. So a restoration there would not be a ... You would be preventing it from coming in, not doing some kind of restoration or repair from any damage it did while it was there. Judge Kelly, I would disagree with that. The reason that the offices were shut down and the practices were put on hold was that it was not healthy to run a dental practice in the offices during the COVID pandemic. Because as the CDC and the American Dental Association said, it would be dangerous to allow patients to come in who are potentially infected with the virus. Liquid gets spewed, their saliva gets spewed around the office, so it was unhealthy to run the office at that time. They needed the filters and the protective equipment in order to be able to run a healthy dental practice. So your honors, that brings me to the virus exclusion, which says that it excludes a loss caused directly or indirectly by the presence, growth, proliferation, spread, or any activity of fungi, wet rot, dry rot, bacteria, or virus. None of the 17 appellate decisions dealt with virus exclusions that use this language or anything like it. The question for this court is this, does the exclusion apply no matter where the virus is located, as the defendants argue? We call that an anywhere in the world exclusion and anywhere in the world interpretation of the exclusion, or does it apply if the virus is only located in the insured's premises, which is what we maintain? If it's the latter, the exclusion isn't applicable because as Judge Kelly pointed out, the virus was never in the plaintiff's premises. The policy doesn't say which way it applies. It's silent about it, so the court has to draw an inference, and in drawing that inference under Missouri law, the insurer bears the burden of showing that an exclusion applies, and the exclusion must be strictly construed against the drafter. That's the Burns versus Smith case in Missouri Supreme Court, the Eighth Circuit's case in Minden, and a number of other cases. So is there anything about the text of the exclusion itself that you think points in that direction, or do you just rely on a canon of strict construction? No, Judge Collin, absolutely. We rely on what the exclusion says. It excludes losses caused by, and here are the key words, presence, growth, proliferation, spread, or any activity of the virus and the other excluded items. If this were an anywhere in the world exclusion, those words would have no place. To apply anywhere in the world, it could just say that it excludes losses caused by a virus, period. The words have to mean something under Missouri law, and so they have to limit the exclusion to viruses in the insured's premises. Now the defense- I mean, the presence of the virus suggests on the premises, right? But the proliferation, spread, growth, doesn't that suggest that that could be something somewhere other than on the premises? I assume you disagree with that, but- Yeah, because those words aren't needed for that. You could just say, there's an exclusion caused by virus. There are exclusions- But perhaps if it's on the premises, they're not needed either. The existence of a virus on the premises, period. And here we have additional language, right? Yes, it wouldn't be needed, but the fact that we have that additional language points to the fact that it has to be in the premises. Because otherwise, you could just take it out and it would just say virus. And we have to interpret that with a strict construction against- I guess the anywhere in the world view, the anywhere in the world would also apply to fungi somewhere in the world that caused the office to close. That would be excluded under the insurance company's view. I assume so. I mean, that was- they didn't argue that, but I would assume so. That's the logic. Okay. Your Honor, the third issue, there's never been another appellate court decision regarding the limited virus coverage we have in this policy. I'll rest on what's in the brief. And if there are no further questions, I'll reserve the time and ask that Your Honors reverse the district court decision. Very well. You may reserve the balance. Thank you for your- Mr. Fryman, we'll hear from you. Thank you and good afternoon, Your Honors. May it please the court. I am Jonathan Fryman on behalf of the appellees. I applaud my friend, Mr. Kornfeld, for being candid about the state of the law at the beginning of his address. At this point in time, eight federal circuit courts have addressed the question of whether provisions commonly found in commercial property insurance policies provide coverage for the loss of use of businesses during the COVID-19 pandemic. All eight of those have concluded in the same way, that there is no such coverage. That's also true, by the way, of every state appellate court to address this issue. And there hasn't been a single dissenting judge on any of those panels, federal or state. I want to start off with this court's decision in oral surgeons, which of course focuses on the physicality of the loss as being the necessary factor. The loss to property has to be physical in nature. And that's why oral surgeons said a loss of use is not enough. And I want to jump right to the distinction that opposing counsel is making between loss of and loss to, which I think is a red herring. Of those seven other circuit courts to have considered the question of the direct physical loss of property in this particular context, six of them are looking at language involving the direct physical loss of property. Six of those seven. And it's also true with this circuit's own precedents. In the Pentair decision, this court looked at a clause that said direct physical loss of property and said loss of use is not enough. So it's not the preposition that matters. It's not the two letter preposition that matters. It's the adjective that matters, physical loss. And in order to understand physical loss, we look not only at the way that all of these federal and state appellate have interpreted direct physical loss of or to property, but we also look at what's connected to the direct physical loss of property in the policy, which is the period of restoration. It has to be something that causes someone to have to replace, restore, or rebuild property. Now, there's nothing here that happens to cause the rebuilding, replacement of, or restoration of as many procedures as they did before COVID hit. They were only doing emergency procedures, but the property didn't change. And the things that Mr. Kornfeld points to in his briefs of arguments, the need to get a new kind of gown, new kind of mask, or a new kind of filtration system, this is not physical damage to the property. These are ordinary costs of doing business to deal with changing circumstances. These are additions, alterations. These are not reconstructions or rebuilding or repairs. No ordinary person would say that a new dental gown is a repair to the property. I think that's an important point. Unless there are any further questions on direct physical loss, I'll turn to the other grounds on which the district court dismissed, which is the biosecurity. Just so you know, we're getting a little bit of interference with your audio. My apologies, Your Honor. Maybe it's that Mr. Kornfeld was not muted. That might have been it. He just muted. So let's go ahead and see if that solves it. Okay. I'll repeat my last. Yeah, no, we could hear you. And I think it was the Kornfeld microphone. So I think we're good to on to your next. So if there are no questions on direct physical loss for me, I will turn to the virus exclusion, which was the other grounds for affirmance by the district court. And I think same thing. There have been, by our count, over 75 district court opinions. I believe the number may be up to 85 at this point, that have looked at this virus exclusion and have found that it has not bubbled up to the appellate level yet. But the level of uniformity among the district courts is absolutely striking. And that's for good reason. There is no ambiguity in the language here. It says that we will not pay for loss or damage caused directly or indirectly by presence, growth, proliferation, spread, or any activity of virus. Let me just start with that. There's he's imagining other ways of phrasing the exclusion and saying, I could imagine a more economical way of phrasing the exclusion. I can imagine doing it with fewer words. Well, that's not a principle of law in Missouri. The question is whether this is an ambiguous phrase. You don't use- Mr. Freiman, it does sort of seem when you see the list here, fungi, wet rot, dry rot, bacteria, then virus does sort of, in my sort of lay person approach to the words, seems like a different word. Like I can imagine wet rot and dry rot and maybe some bacteria getting in your physical space. But virus does seem sort of like a different word here that doesn't sort of contain itself in the same way as the other ones. Can you address that at all? And in other situations where virus might kick in? Because I'd be surprised if somebody thought of a pandemic. And I don't think that that necessarily answers the question, but it does cause me to sort of scratch my head a little bit about the list. Well, the question is, I suppose, Judge Kelly, whether all of these items are of the same type or whether they're of different types. I think certainly bacteria and virus are similar types of things. That is, they're things that can cause disease and spread widely. That's also true, by the way, of fungal infections, which can be spores that are wind borne that spread widely. So there's not a limitation here in terms of the location. And the question is, I mean, what about rot? Doesn't that imply location? It probably does, your honor. It's probably more likely that wet rot or dry rot is something that is limited to the location, but that's not something that the text requires. I just think as a practical matter, that's probably would be true by nature of what wet rot and dry rot are, as opposed to what the nature of virus and bacteria are, which are things that do spread. And I want to draw your attention to the bottom of the list. Well, what I thought was if wet rot and dry rot are necessarily tied to the property, and if we should interpret the terms as a group and give them like meanings, does that support a view that the other three terms should also be limited to viruses and bacteria that are tied to the property? No, your honor. I don't think so. These are clearly distinct terms that are listed together. It's a group and there's no indication that they are all meant to be the same type of thing. This is a list of separate items, all of which are excluded if they are the direct or indirect cause of the loss or damage. And this notion of kind of premises, off-premises, this hobgoblin of anywhere in the world that opposing counsel raises, if you look at the last line of the exception, this is on page 199 of the joint appendix, it says, this exclusion applies whether or not the loss event results in widespread damage or affects a substantial area. There would be no reason for those words if it was only limited to an office. Something just in an office is not something that affects a substantial area or results in widespread damage. There's a clear recognition here in the virus exclusion that these are events that can affect not only the premises. And indeed, in a broader sense, it would be ridiculous to assume that there's an on-premises requirement that's not written into the language of the policy for exclusions. There are other exclusions in this a dental office, but there's a war that can affect a dental office. There's a dishonesty exception. The dishonesty doesn't have to happen at the dental office. It just has to cause damage or loss at the dental office in order for the exclusion to be triggered. So the question is whether this language is clear. It is clear beyond a doubt that these dentists heeded the advice of professional organizations and government officials to restrict their patient population during the pandemic because of the virus that was causing the pandemic. Mr. Fryman, I may be confused here. If we find essentially that oral surgeons applies here and that we need physicality, do we need to address the virus exclusion issue or not? You don't need to. Some circuit courts have chosen to do both to provide additional guidance to the district courts within their circuit, within the relevant state law. But no, if you ruled for us on direct physical loss, then you could affirm on that basis alone. Following oral surgeons and again, going back to that, of course, as this court knows in oral surgeons, the court is deciding the case under Iowa law, but it's applying Minnesota precedent because it's saying that these basic principles are the same in both of those states. We set out in our brief why that's true for Missouri as well. And opposing counsel offered no rebuttal to that whatsoever in the reply brief or here, nor could he. And that's why the federal circuits are unanimously coming out the same way on this. These are the broadest principles of contract and insurance policy interpretation that are at issue and they do not differ in any meaningful way from state to state. In fact, just an hour or two ago, the sixth circuit came down with another decision, this time applying under Kentucky law, applying its Santos holding, which was under Ohio law. These same general principles are the same. And if you find that there was no direct physical loss of property to the policy holders here, then that is enough to affirm. I do want to address briefly, and this connects with your question, your honor. I want to address this notion of limited virus coverage with Mr. Kornfeld said he would rest in his papers on, but I think it's important to point out at least one thing. And that thing is that the limited virus coverage, which itself is an exception to the virus exclusion, that limited virus coverage itself requires direct physical loss. It requires direct physical loss of property and it requires it in two different places. You only need to agree with me on one of these in order to, to, to agree with me on the overall idea that there is no limited virus coverage here. One of those is the very standalone provision that opposing counsel says you can yank out of the rest of this endorsement, yank out of the rest of the limited virus coverage and look at just this one sentence in isolation. We don't think you should do that. That's not the way Missouri asks courts to interpret contracts or insurance policies. But even if you do that, if you look at just B1F all by itself, and I'm looking at page 200 of the joint appendix at this point, it says the following applies only if a time element coverage applies to the scheduled premises. And everyone agrees that a time element coverage here is either business income or extra expense coverage, the very ones that are invoked by opposing counsel. And only if the suspension of operations satisfies all the terms and conditions of the applicable time element coverage. In other words, you need to satisfy all the terms and conditions of the business income or the extra expense provisions. And those of course are the very provisions that require direct physical loss of property. So it doesn't help opposing counsel in any way to invoke the limited virus coverage. It just brings them right back to the beginning, right back to this court's decision in oral surgence. He still needs to show direct physical loss. Now I promised you that I'd tell you too. I thought maybe I missed the analytical framework of the argument, but I thought his point was if we win on the first issue, but lose on the exclusion issue, then we can win on the virus coverage because we've already won on the first issue. And I understand you're saying he should lose on the first issue and therefore we never get to the second and third. But is he right that if he wins on the first issue, he beats you on the virus coverage even if you're right about the exclusion? Or do you have a separate point on the virus coverage? There are additional points as to why the limited virus coverage does not apply. However, he's correct if he stated this, that if in fact this court disagrees with oral surgence, finds that Missouri law is different, and that in direct physical loss merely because of a loss of use. If this court becomes the first circuit court panel in the United States to hold that, then that would likewise be true that the time element coverages, they would have established direct physical loss for the purposes of those time element coverages. There still wouldn't be limited virus coverage because the limited virus coverage has other requirements which are set out in the briefs. And I don't know that I want to use this court's time in going through them in any detail, but that provision, the B1F provision on page 200 of the joint appendix, says that the plaintiff has to suffer a loss that results in the virus. That loss itself does not require the suspension of operations, but the virus then causes the suspension. Now the plaintiffs here don't allege a loss that resulted in a virus. They allege that there were CDC recommendations, that there were dental association recommendations, but that's not, those recommendations are not a loss that resulted in the virus. The virus preceded those recommendations. Those recommendations were a response to the virus. So he gets it backwards on the terms of B1F, even separate from the idea of direct physical loss. I see I'm down to my There's an effort here, and it's an effort that all eight federal circuit courts that have faced this have seen, to squeeze into commercial property insurance policies costs that are incurred in the COVID-19 pandemic. Those efforts require the distortion of the language of the covering language. They require the distortion of case law, and they're completely contrary to the purpose of commercial property insurance policies. These add-on provisions, business income, extra expense, are intended to help make policy holders whole when they have suffered damage or loss to their property in the way that those terms are meant in ordinary speech and in long-standing case law across the nation. I thank you, your honors. We ask that you affirm. Very well. Thank you for your argument, Mr. Freiman. Mr. Kornfeld, you may now turn your microphone back on, and we'll hear from you in rebuttal. Thank you, and I apologize for getting to put myself on mute. Your honors, what I would like to talk about is oral surgeon's application of its reasoning to the phrase loss to. We're not asking that your honors overrule oral surgeons, of course. What we're saying is that there is a difference between loss of and loss to, and you only have to go back to the source food technology case to see that where the court said that was also a loss to policy. The court said, moreover, the policy's use of the word to in the language direct physical loss to property is significant. Source food's argument might be stronger if the policy's language included the word of rather than to as in direct physical loss of property. The court, that was a year after, only a year after the Pentair decision. The Pentair policy did say direct physical loss of property, but that's not what the plaintiff relied upon. The plaintiff relied upon a provision that applied to a factory in Taiwan that was a supplier and that lost its electrical power. There, as the court says on page 614 in Pentair, Pentair relies for coverage on section 10B2, the contingent time element provision, which further extended the business interruption coverages to include losses incurred by Pentair as the result of damage to property of a supplier. Again, a loss to policy. Your honors, thank you. I think I'm over time and I apologize for that. I would ask that you reverse. Very well. Thank you for your argument. Thank you to both counsel.